1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Sarah M. Matz (SBN 312051)
ADELMAN MATZ P.C.
1159 Second Avenue, Suite 153
New York, New York 10065
P: (646) 650-2207
F: (646) 650-2108
E-Mail: sarah@adelmanmatz.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**MIKE BINDRA**, an individual,
                            Plaintiff,

v.

**ALESSANDRO CIANI**, an individual
and **LUXURY BUSINESS CONCEPT,
INC,** a corporation duly incorporated in
the state of California;

                            Defendants.

Case No.:  __23-cv-10765__

**Complaint filed:** December 26, 2023

**COMPLAINT**
1) **Fraud**
2) **(In the alternative) Breach of Contract**
3) **(In the alternative) Unjust enrichment**

**JURY TRIAL DEMANDED**

Judge:
Dept:

Plaintiff, Mike Bindra ("Bindra" or "Plaintiff"), by and through his attorneys Adelman Matz P.C., hereby files the instant complaint, as and for his claims against Defendants Alessandro "Alex" Ciani ("Ciani") and Luxury Business Concept, Inc. (the "Company") (collectively "Defendants") upon knowledge as to himself and his own actions and upon information and belief as to all other matters alleges as

1
**COMPLAINT**

follows:

## NATURE OF THE ACTION

1.     This is an action for fraud against the Defendant for the fraudulent sale of a watch, namely the Audemars Piguet ref. 5402/344 Royal Oak ("AP Watch") bearing Serial No. 147587/99183 N. A 1950' for one hundred and twenty-eight thousand dollars ($128,000.00) and in the alternative, breach of contract and unjust enrichment in violation of *inter alia* California common law. Bindra seeks declaratory relief as well as compensatory and punitive damages against Ciani, including fees and interest that continue to accrue as a result of the aforesaid actions.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 (a) and (c) because the amount in controversy exceeds $75,000, and the dispute is between citizens of different states. The Plaintiff is currently residing in Spain and is a citizen of the State of Florida. Upon information and belief, Ciani resides in Los Angeles, California, and the Company was incorporated in and is headquartered in Los Angeles, California.

3.     This Court has personal jurisdiction over Ciani because, upon information and belief, Ciani resides in this Judicial District.

4.     The Court has jurisdiction over the Company because, upon information and belief, the Company was incorporated in and is headquartered in this Judicial District.

5.     Upon information and belief, venue is proper in the Central District of California pursuant to 28 U.S.C. §1391(a) and (b) because a substantial part of the events and omissions giving rise to this claim, occurred in this Judicial District and Defendants are subject to personal jurisdiction in this district.

## PARTIES

6.     Bindra is an individual who has been engaged in various business ventures and is a collector of and investor in rare, original, correct collectible vintage

watches and was in New York at the time of the sale.

7.    Ciani is an individual with his business address in Los Angeles County and is a dealer and seller of rare, original, correct, collectible vintage watches. Ciani also advertises himself as one of the "world's greatest experts" in the international vintage watch market.

8.    Upon information and belief, the Company is a corporation duly incorporated under the laws of the state of California, with its principal place of business at 2629 Townsgate Rd. Suite 235, Westlake Village, CA 91361.

## FACTUAL ALLEGATIONS

9.    On Defendant's official website, which can be found at www.alessandrociani.com, the Defendants describe Ciani as "one of the world's greatest experts" in collectible watches.  In his "intro[duction]," Defendants state that Ciani buys "only the extraordinary," and that his watches are a "wise investment." Defendants further state that Ciani is a "vintage watch specialist and aficionado" and has been a "major player in the international vintage watch market since the late 80s."

10.    To attract investors like Bindra, Ciani also states that "[h]is original views on what makes a watch really special, and a keen eye, characterize his total dedication to the quest [for] top quality, *uncompromised condition*, high-end vintage timepieces [and] make him the *ideal purveyor* of exclusive and selected collectables for the demanding and *discerning investor*" (emphasis added).

11.    Ciani also has multiple blog posts on his website, where he writes in detail about the factors that contribute to the value of a vintage watch, such as its correctness, condition, authenticity, and originality. These blog posts are meant to bolster his clients' confidence in Ciani's skill as an expert.

12.    Indeed, Ciani made similar representations of his prowess and expertise directly to Bindra.

13.     Upon information and belief, due to Bindra's reputation, Ciani was aware that Bindra is an investor and potential client for Ciani, who enjoys a reputation as a collector of vintage watches of the highest quality.

14.     In 2017, Bindra started dealing with Ciani for the purchase of vintage collectible watches. Ciani used his interactions with Bindra to bolster Bindra's trust in Ciani's ability to authenticate and guarantee the watches in his collection, and Bindra made it absolutely clear during all his interactions that Bindra was only interested in investing in pieces that were authentic, verified, and unadulterated with no signs of retouching or repurposing. Ciani also knew that Bindra would pay top dollar for the pieces he was interested in purchasing, given that they were properly authenticated, verified, correct and unadulterated.

15.     Indeed, Ciani was aware of Bindra's particularity over the originality and correctness of the watches sold to him because Bindra had previously returned a watch Ciani had sold him due to the fact that the dial had been restored and was therefore no longer original and adulterated.

16.     As a dealer of vintage watches and an "expert" on their originality, correctness, and authenticity, and knowing Bindra's expectations, Ciani represented he would authenticate, conduct due diligence and properly inspect the watches he offered to Bindra for sale.

17.     It is also an implicit understanding in this industry that the dealer's role and purpose within a transaction is to bring his or her expertise to protect the buyer and ensure that the watches in the dealer's collection are properly authenticated, verified and correct.

18.     In writing, Ciani also "guaranteed [the authenticity of the watches sold to Bindra] against any level of inspection."

19.     Due to discussions with Bindra, Ciani was aware that Bindra was looking for a first edition 5042 A-Series Royal Oak watch – the genesis iteration of the Royal

Oak watch which is one of the most important designs of one of the most prominent and historically important Swiss watch manufacturers in the world - Audemars Piguet.

20.     According to the official Audemars Piguet chronicles on their website, the 5402 is the first Royal Oak Model ever designed. Of this model, there were only one thousand, nine hundred and thirty-seven (1937) units bearing the first edition "A series" number, and only four (4) were sold in the year 1978.

21.     As a seasoned investor and given that the demand for the Royal Oak design was growing in the market Bindra anticipated that procuring one of the first and rare limited A-series vintage watches of this unique Audemars Piguet Royal Oak 5402 Model would prove extremely valuable as such a watch could be sold later at a high profit.

22.     While perusing Defendants' official Instagram page, Bindra noticed the AP Watch, the first of its kind, Royal Oak 5402 A-series - first edition iteration of the unique Audemars Piguet design that Bindra had been looking for, in practically factory new condition.

23.     In industry parlance such a factory new condition is called New Old Stock ("NOS"). This term of art is used for those watches in the vintage market which though are "vintage", still look "factory new", because they have been barely worn and therefore do not have the usual signs of aging or wear and tear. Such a condition in a vintage watch is almost impossible to find, making those rare jewels that do classify as NOS extremely valuable. The watches that enjoy this NOS condition end up being worth at least three or four times the market price of a vintage watch in good but not NOS condition.

24.     Seeing the AP Watch in NOS condition, a first iteration A-series Royal Oak design that Bindra had already been looking for, was an anomaly.

25.     Therefore, in early 2018, Bindra inquired about the AP Watch from Ciani.

26.     At this point, Ciani told Bindra that the AP Watch was not for sale.

27.     In around June 2018, Ciani mentioned that he was exhibiting a collection of his watches for sale at the auspicious Asprey retailer in London, which is one of the largest and most revered institutions for luxury items which caters to an exclusive clientele including royals of the United Kingdom. Ciani mentioned that the AP Watch had been on display at the event and mentioned that he was trying hard "not to sell" it so he quoted one hundred and fifty thousand ($150,000) for it at the Asprey Exhibition.. Telling Bindra that it was displayed at the Asprey Exhibition was no doubt meant to bolster Bindra's reliance regarding its authenticity and induce Bindra into believing that it was correct, authentic, and worth the money Ciani was quoting for it.

28.     Still being interested in the AP Watch and knowing that Ciani was now willing to sell it, Bindra expressed an interest in purchasing the AP Watch and inquired about its condition, authenticity, quality, correctness, and chain of custody.

29.     Ciani represented to Bindra that the AP Watch had been brought into a jeweler that Ciani had a relationship with and that the AP Watch was in NOS condition, and it had its "Full Set" intact. In vintage watch industry parlance, having the Full Set means that the vintage watch comes with all it's original accessories, including the original inner and outer boxes, hashtags, guarantee and original certificate of authenticity as provided to the purchaser by the manufacturer at the time of its original sale.

30.     To ensure it was immaculate, correct, authentic and unadulterated, Bindra also specifically and repeatedly asked Ciani about the box, the chain of custody, and asked him to ensure that he had conducted his due diligence and personally inspected and verified the authenticity, originality and correctness of the AP Watch and its parts (including the movement).

31.     To inspect a vintage watch's movement, one must very carefully open the back casing and inspect the serial number indicated inside the movement so as to not damage the vintage watch or harm its condition – only a dealer or expert such as Ciani or a watchmaker, can properly undertake this task.

32. To that end, Ciani also provided Bindra with pictures of the case, the dial, and some blurry pictures of the movement. The pictures of the movement did not show the serial number on the movement as the picture of the movement was taken from a distant angle and was blurry and out of focus, as well as of a low resolution. The minute movement numbers engraved inside were completely obscured due to the low resolution of the picture. However, these pictures were provided precisely to give the Bindra the impression that Ciani had personally inspected the movement and that the movement was correct.

33. Ciani also confirmed in writing that he had personally inspected everything and conducted his due diligence. Due to Bindra's prior dealings with Ciani, it was expected that Ciani would have taken all steps to verify the authenticity of the AP Watch.

34. Therefore, when Ciani stated that the AP Watch is "[p]robably the world's nicest and most complete," Bindra justifiably relied on his representations and believed that Ciani conducted his due diligence to verify its authenticity, correctness and unadulterated state.

35. Ciani quoted the price of the AP Watch as one hundred and twenty-eight thousand dollars ($128,000), which was much higher than the normal market value of a Royal Oak A-series vintage watch at the time.

36. However, the fact that Ciani had represented he had verified and authenticated that this particular item was perfectly authenticated, unadulterated, correct and that not only was it the rare 5402 A series (one of the first units of the iconic Royal Oak design) but that it was in NOS condition *and* came with a Full Set, made Bindra amenable to purchasing the AP Watch, which he considered a singular marvel, and worth the quoted price of one hundred and twenty-eight thousand dollars ($128,000).

37.    Ciani confirmed that the watch "looked good" indicating that he had done his due diligence and represented that the AP Watch was authentic, correct, and original and without any issues whatsoever that could materially affect its value.

38.    On June 25, 2018, based on Ciani's representations, Bindra purchased the AP Watch for one hundred and twenty-eight thousand dollars ($128,000), a significantly higher price than it's market value.

39.    In around August 2018, when Bindra received the AP Watch, he inquired about a different issue regarding the screws of the AP Watch, which did not match the pictures sent to him by Ciani.

40.     Once again, Ciani represented to Mr. Bindra that the AP Watch was the "perfect one with the papers."

41.    Ciani knew that Bindra trusted Ciani, and that Bindra would rely on him and keep the AP Watch if Ciani continued to give Bindra guarantees regarding the authenticity, originality, and correctness of the AP Watch; therefore, bolstering Bindra's reliance on Ciani's representations and allowing Ciani to retain the proceeds from the fraudulent sale of the AP Watch.

42.    Recently, in or around March 2023, Bindra sent the AP Watch to a potential auctioneer for sale.

43.    It was then that Bindra discovered that the movement in the AP Watch bears a different serial number than the serial on the original papers that Ciani provided—the serial number indicated on the movement of the AP Watch is actually "147531" and not 147587.

44.    Only after learning of this discrepancy, Bindra discovered the falsity of Ciani's representations as only Ciani could have inspected the movement. That he misrepresented the correctness and authenticity of the AP Watch and even provided pictures to that effect, which deceivingly concealed the serial number in the movement – illustrate that Ciani intended to deceive Bindra and was aware his representations were false and false when made.

45.     Ciani would have had to see the serial number on the movement of the AP Watch when he opened it, inspected it, and took blurry photos of it.

46.     Moreover, it belies belief that Ciani, a self-proclaimed "expert dealer" and "aficionado" in the vintage watch industry, was not aware that "the world's best and most complete" vintage watch had an entirely different serial number on its movement, than the one on its original papers, especially given that he had opened the watch.

47.     Indeed, the only plausible explanation is that Ciani was aware that his representations were false, and that is why he could not sell the watch earlier but given Bindra's interest and the trust he had built with Bindra, he knew he could induce Bindra to justifiably rely on his misrepresentations.

48.     Ciani successfully induced Bindra to buy and keep the AP watch so that Ciani could keep the proceeds from the sale, which were much greater than the market value of the AP Watch.

49.     Bindra never would have purchased the AP Watch at such a high price, except for the fact that Bindra relied on the false representations made by Ciani regarding its correctness, completeness and authenticity.

50.     The AP Watch, had it been properly authenticated, correct, with the NOS condition and the Full Set, would have been worth significantly more had it been correct and placed on auction.

51.     However, because of the discrepancy in the serial number of the AP Watch's movement, its value has been significantly undermined and the most reputable auction houses, have refused to accept it. Instead, if Bindra tries to sell this incorrect AP Watch in a second-tier auction houses, he would not even be able to sell it for the full purchase price of one hundred and twenty-eight thousand dollars ($128,000) that Bindra paid to Ciani, it would sell for significantly less.

52.     As a direct and proximate result of this fraud, Mr. Bindra has suffered both financial and reputational damage.

53.     Bindra is known in the vintage watch industry as an investor in some of the rarest vintage watches that exist – auction houses and other investors alike, trust that the watches Bindra offers for auction have been verified. Therefore, the fact that Bindra sent an unauthenticated watch to the Phillips Auction House causes harm to his reputation for collecting only the absolutely highest quality pieces. Further harm has been caused to Bindra's reputation because he now has to turn to second-tier auction houses to sell this AP Watch.

54.     Moreover, Bindra has been damaged in the difference between the amount of the AP Watch's actual market value versus the amount Bindra paid for the AP Watch.

55.     Moreover, Bindra has further been damaged because he has been deprived of the profit from a sale of the AP Watch as it could have been sold had it been authentic, original and correct.

56.     Similarly, Bindra has been damaged in the amount of profit had he invested into another A-series Royal Oak, which Bindra knew could be sold at a much higher profit.

57.     Further, Bindra has been deprived from the profits from a different sale had he invested the funds of one hundred and twenty-eight thousand dollars ($128,000) into a different piece.

## FIRST CAUSE OF ACTION

### Fraud

### (against Defendants)

58.     Plaintiff repeats and re-alleges all the allegations set forth in Paragraph 1-57 of the Complaint.

59.     Ciani represented that the AP Watch was properly authenticated, "looked good" and was the "perfect one with the papers."

60.    Bindra discovered in March 2023 that the AP Watch was not authenticated, instead, the movement bore a different serial number than the one on the original papers.

61.    The authentication, correctness of the serial number and condition of the vintage watch are all material factors which significantly affect the value of the AP Watch.

62.    Ciani had knowledge of the falsity of his assertions as he was the only person who could inspect the AP Watch and guarantee its authenticity and correctness. Upon information and belief, Ciani deliberately made false representations regarding its authenticity, correctness and concealed that it had a different serial number in the movement, which Ciani knew would materially depreciate the value of the AP Watch.

63.    Ciani intended to defraud Bindra so he could gain and retain the funds from the sale of the AP Watch.

64.    Bindra did not and could not have known of the different serial number on the movement, which is concealed behind the back-casing of the AP Watch and could not have been manually inspected by Bindra.

65.    Bindra was relying on Ciani's inspection of the AP Watch and relied on the representations made by Ciani, assuming after his guarantees that they were true.

66.    Due to Bindra's reliance on Ciani's false misrepresentations, Bindra has been damaged directly and proximately in an amount to be determined at trial, but no less than one hundred and twenty-eight thousand dollars ($128,000) plus, the profit that Bindra could have gained from the sale had it been the authentic, unadulterated AP Watch that Ciani represented it to be.

67.    Bindra is entitled to monetary damages in an amount to be determined at trial, but no less than the amount needed to restore Bindra to the financial position enjoyed by him prior to the fraudulent sale, plus the amount that Bindra would have enjoyed had the false representation been true, plus attorney's fees and costs.

68.     Further, Bindra is entitled to the maximum award of punitive damages because Ciani intentionally deceived Bindra knowing that Bindra was relying on Ciani's representations which demonstrate a wanton dishonesty meant to deliberately deceive Bindra.

**SECOND CAUSE OF ACTION**

**IN THE ALTERNATIVE**

**Breach of Contract**

**(against the Company)**

69.     Plaintiff repeats and re-alleges all the allegations set forth in Paragraph 1-68 of the Complaint.

70.     In the alternative, the Plaintiff asserts a cause of action for breach of contract against the Defendants.

71.     Ciani executed a purchase order on behalf of the Company for the sale of the AP Watch consideration of one hundred and twenty-eight thousand dollars ($128,000).

72.     Bindra promptly paid the entire consideration for the authenticated, correct, and original AP Watch and has therefore performed all obligations under the contract.

73.     Upon information and belief, Ciani is the sole owner of the Company and caused the Company to breach the contract.

74.     Upon information and belief, Ciani sold the AP Watch knowing that it bore a different serial number than the original papers.

75.     By failing to provide the correct, authenticated, and original AP Watch, Ciani caused his Company to breach the contract for sale of the AP Watch and reneged on all obligations under the contract.

76.     As a direct and proximate result of this breach, Bindra has been damaged in an amount to be determined at trial, of at least one hundred and twenty-eight thousand dollars ($128,000) with interest thereon.

77.    Bindra is entitled to compensatory damages and recission of the contract as a result of the breach.

### THIRD CAUSE OF ACTION

### IN THE ALTERNATIVE

### Unjust Enrichment

### (against Ciani and Ciani's Company)

78.    Plaintiff repeats and re-alleges all allegations set forth in paragraph 1-77 of the Complaint.

79.    In the alternative, Bindra seeks to recover the difference between the value of the AP Watch currently and the value that Bindra paid for the AP Watch, with interest thereon, based on a claim of unjust enrichment.

80.    Defendants have been unjustly enriched at Plaintiff's expense, for which equity and good conscience requires restitution.

81.    Accordingly, Bindra has sustained damages in an amount that shall be proven at trial which includes, but ais not expressly limited to, monetary damages sustained as a result of Ciani's unjust enrichment from the sale of the AP Watch, in amounts beyond what he is entitled to, plus interest, costs, disbursements, and attorneys' fees.

### PRAYER

**WHEREFORE**, Plaintiff respectfully demands judgment as follows:

a)  That on the first cause of action, the Court enter judgment against Defendants for:

    i.    Declaratory relief stating that Ciani committed fraud on Bindra by fraudulently selling the AP Watch knowing that there was a discrepancy in the serial number on the movement of the watch and on the original papers; and

    ii.   Damages in an amount to be proven at trial, which include, but are not expressly limited to, monetary damages sustained as a result of

Ciani's fraudulent sale of the AP Watch, as well as punitive damages, interest, costs, disbursements and attorneys' fees;

b) That on the second cause of action, in the alternative, the Court enter judgment against the Company for Damages in an amount to be proven at trial, which include, but are not expressly limited to, monetary damages sustained as a result of the Company's breach of contract, as well as interest, costs, disbursements, and attorneys' fees.

c) That on the third cause of action, in the alternative the Court enter judgment against Defendants for Damages in an amount to be proven at trial, which include, but are not expressly limited to, monetary damages sustained as a result of Ciani's unjust enrichment from the sale of the AP Watch, in amounts beyond what he is entitled to, plus interest, costs, disbursements, and attorneys' fees;

d) For judgment for interest and costs of suit and for such relief as is fair, just, and equitable; and

e) For reasonable attorneys' fees, and any such further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial on all issues so triable.

Dated: December 26, 2023

Respectfully submitted,

ADELMAN MATZ P.C.

By:_____

Sarah M. Matz, Esq. (SBN 312051)
1159 Second Avenue, Suite 153
New York, New York 10065
Tel: (646) 650-2207
E-Mail: sarah@adelmanmatz.com

*Attorneys for Plaintiff Mike Bindra*